**DANIEL KRIEGMAN, PH.D.**
20 DORCAR ROAD
CHESTNUT HILL, MA  02467

(617) 527-1631

October 1, 2019

Richard C. Chambers, Jr.
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940

     Re: Emanuel Panousos, DOB: 8/1/75

Dear Mr. Chambers:

    I am a psychologist licensed by the Commonwealth of Massachusetts since 1981.[1] I have been designated a "Qualified Psychologist"[2] in accordance with 104 CMR 3.20 (2) pursuant to the provisions of Massachusetts General Laws c. 123 § 12A.  For evaluations of "sexual dangerousness"  under M.G.L. c. 123A[3] § 2, I was designated a "Qualified Examiner" by the Massachusetts Department of Mental Health.  In addition, I have extensive experience evaluating  and treating a wide variety of patients for over 45 years.[4] My resume is attached.

IDENTIFYING INFORMATION AND THE CONTEXT OF THE EVALUATION

    I am writing in regard to your client, Emanuel Panousos, a 44-year-old man who has been charged with Aiding and Assisting in the Preparation of a False Tax Return (two counts) related to under reporting income from Mike's Famous Roast Beef and Pizza (referred to below as Mike's), a restaurant he owns and runs.  He will be pleading guilty to the charges and this evaluation was prepared at your request as an Aid in Mitigation of Sentencing.  My examination of Mr. Panousos began on July 2, 2019, also at your request.  At that time, you were concerned that Mr. Panousos was very depressed, agitated, and sleeping poorly with a related deterioration in functioning (including some serious hallucinatory symptoms secondary to the sleep deprivation).

    After two sessions, I determined that his condition was, in fact, poor and suggested a delay in the court proceedings that was subsequently granted to allow more time for an evaluation.  My initial sessions with Mr. Panousos were followed up by two family therapy sessions (with Mr. Panousos and his mother, Theodora Panousos).  The last

---

[1] I have been designated a Health Service Provider under M.G.L. c. 112, § 120.

[2] 104 CMR 3.20 (2) described the qualifications and procedure to designate as "Qualified Psychologists" those psychologists who could determine if someone needed to be committed to a mental hospital because they posed a danger to self or others.

[3] C. 123A is the statute in Massachusetts that calls for the civil commitment of sex offenders who are found to be "sexually dangerous" for a period of "one day to life" (i.e., until a court finds that they are no longer sexually dangerous).

[4] In 1976, I began evaluating and treating patients suffering from psychotic disorders at Boston State Hospital (the West-Ros-Park Inpatient Unit).  From 1977 until 1986, I worked as a clinician at the Massachusetts Treatment Center for Sexually Dangerous Offenders, where I eventually held the dual positions of Director of Supervision and Training and Director of Intake and Treatment Planning.  In addition to my involvement in hundreds of evaluations of sexual dangerousness as a psychologist at the Treatment Center, since leaving there in 1986, I have testified in the Superior Courts of Massachusetts as a "Qualified Examiner," and as an expert in other c. 123A hearings on more than 400 occasions and have written well over 450 evaluations of sexual dangerousness.  I founded and ran the Human Services Cooperative, Inc., which for several years held the contract with the Commonwealth to provide all of the psychiatric and psychological evaluations (including all sexual dangerousness determinations for the State) under c. 123A, the Commonwealth's sexual dangerousness statute.  I have also evaluated and testified in numerous competency and commitment hearings under c. 123, the Commonwealth's general mental health statute.  In addition, I have been qualified as an expert witness in psychology in Iowa, New York, and the United States District Court (District of Massachusetts).  I have a private practice with adolescents and adults; I have been evaluating and treating patients suffering from a variety of mental disorders including major mental illness for over 45 years.

scheduled session was canceled at the last minute as Mr. Panousos had a critical shortage of employees at Mike's. More recently, Theodora has been out of the country on a trip to Greece, and whether or not the treatment is resumed when she returns will depend on the sentencing in this case.

## HISTORY AND DIAGNOSTIC IMPRESSION

As I noted in an earlier letter, during the interviews, Mr. Panousos did indeed look quite depressed. At one point, he appeared to lose consciousness and fall asleep, which he attributed to severe sleep deprivation.

### Family and Community

His parents (William Panousos, age 67, and Theodora Panousos, age 66) along with his brother (Konstantinos Panousos, age 39) were codefendants in a similar case that did not involve Emanuel. That case was the result of their failure to report income earned from their restaurant, Giovanni's Roast Beef and Pizza. William and Theodora pled guilty and were each sentenced to 3 years of probation, fined $150,000, and ordered to pay $550,000 in restitution to the IRS.

His brother, Konstantinos, was recently living in a substance abuse treatment facility in East Boston. (Konstantinos has an extensive history of drug abuse.) Along with his parents, he was also sentenced to three years of probation, fined $150,000, and ordered to pay $550,000 in restitution to the IRS. Konstantinos is married and has a biological daughter and a stepdaughter. His wife suffers from bipolar disorder and hears voices, which tell her to "do things." She has been hospitalized for this condition on more than one occasion when she has been inconsistent in taking her medications. Like Emanuel, in addition to the tax evasion charges, his brother has a limited history of impulsive behavior of the type associated with drug and alcohol abuse (a CWOF charge of Assault & Battery with a Dangerous Weapon [Shod Foot], and Operating Under the Influence of Alcohol). Due to his living in a treatment facility, his brother was unavailable to help run their restaurant (his brother is the owner of Giovanni's) or to help his troubled wife who has had to manage with her children on her own. In addition to running his own restaurant, Mr. Panousos has felt responsible to step in and help out with his brother's family.

Due to the stress and shame of her legal involvement, his mother is also currently unable to go to Giovanni's and face customers. This leaves his elderly father as the only person capable of helping run that restaurant. Every morning, Emanuel drives to Giovanni's, his brother's business and helps his father set up (e.g., by moving 75 lb. bags of flour and helping with other restaurant prep) before he travels to Mike's to begin a long day there. In addition to trying to help out with his brother's family, he appears to be trying to do too much, which is what is causing his exhaustion.

> I wake up at five in the morning. The first thing I do is drive to Giovanni's to help out my dad. ... Then I stop by my mother's place and make sure she takes her medication. ... She gives me holy water [Are you religious?] Spiritual. [Do you go to church?] Sometimes. I try to help people, especially people getting off drugs [Participating in 12-step program?] All the time. I go to AA regularly. Carl Jung said "Avoiding legitimate suffering is the foundation of all mental illness."[5]

While the stress of such long work days and the anxiety regarding the current charges are clearly the cause of his depression, extreme workaholic activity has been part of the family culture all his life. His parents are immigrants from Greece who have always been extremely hard workers. 80 to 90 hour work weeks are the family norm. Mr. Panousos has always been solidly enmeshed in that family culture. He spoke no English until he

---

[5] He quoted Jung twice, once in each of the first two sessions. This psychological notion is apparently a cornerstone of what he learned in AA about his drug addiction.

started going to school, and he is still fluent in Greek. By age ten, he and later his brother were spending all of their free time working in the family restaurant.

He is still quite enmeshed with his parents in an extremely tight family. When I discussed my bill with him, he immediately got on the phone with his mother and (in Greek) asked her to send me a check; in the past, his mother did much of the billing and bookkeeping for him. (The notes found at his parents' house describing the actual, unreported income from Mike's were kept by his mother.) He appears to have never questioned the family's way of doing business (i.e., hiding substantial amounts of income) that were probably brought overseas from Greece, "a country where everyone knows a thousand ways around the rules."[6] Though born here in America, in the context of this extremely close immigrant family, Emanuel Panousos was brought up in that old world culture, a culture in which he remains as seen in his day to day involvement with his family of origin as well as in his marriage and naming of his children.

Mr. Panousos was married to Ms. Nikolaou in 2000. The marriage produced three children: Vasilios (age seven) and twins Natalia and Theodora (age eleven). Mr. Panousos and Ms. Nikolaou separated in 2014 and divorced in 2016. Ms. Nikolaou is unemployed and lives in North Reading with the three children. She and the children are supported by Mr. Panousos who estimates that he provides them with about $2,500/week.

While his relationship with his ex-wife is limited to issues regarding the children, the support he provides appears to be stable and consistent. Mr. Panousos sees or speaks to his children on a regular basis and their well being is of the highest importance to him, though his ex-wife feels their relationship is somewhat superficial. There is some ongoing conflict between the parents regarding how to raise the children but the problems this creates does not seem to threaten the stability of the arrangements they have constructed.

Around the time of their separation in 2014, Ms. Nikolaou obtained a restraining order (that ran for three days) against Mr. Panousos after he allegedly made threatening remarks (that she could not recall) and kicked a trash can around. Despite the conflicts between them,

> she noted that a lot of people in their community love the defendant, who appears to be the type of person who would give anyone "the shirt of off his back." She noted that the defendant does contribute to and sponsor community sporting activities. (Presentence Investigation Report).

On his back, he has had tattooed the names of his children (Natalia, Theodora, and Vasilios), as well as depictions of Christ and the following phrase, "Lord Jesus Christ, Son of God, have mercy on my soul." On the left side of his chest, he has a depiction of a cherub holding a Spartan helmet. On the right side of his chest, he has a depiction of an angel. On his front, left shoulder, he has a depiction of Jesus, and on his right, front shoulder, he has depictions of a dove and the three crosses on Calvary Hill.

In addition to the spiritual themes he has had tattooed on his body, and the close knit involvement with and commitment to his traditional Greek family, he does have a history of volunteering to help out in the community, especially in his involvement in Twelve Step programs as a sponsor. He came to one of our sessions in a good mood. Asked about it, he described driving by a Guatemalan stranger carrying a heavy load. He stopped his car and offered the man a ride. This type of positive, uplifting interaction with others appears to be characteristic of Mr. Panousos as noted by his ex-wife who was otherwise fairly negative when describing her relationship with him.

---

[6]Thanassis Cambanis, "Why can't Greece shake its corruption problem?" *Boston Globe*, August 22, 2014.

**Drug and Alcohol History**

Consistent with the Presentence Investigation Report (7/11/19), Mr. Panousos described a history of substance use/abuse beginning at 15 years old and primarily involving alcohol and marijuana, which he used responsibly. In his twenties, however, a problematic mixture of OxyContin and cocaine ("speedballing") became his "drug of choice." There was some experimentation with other drugs but these were the main problematic ones that he continued to use after his mid twenties. His alcohol use has been fairly moderate and his marijuana use has not caused any discernable problems. In fact, for several years he has used marijuana to manage his anxiety attacks without slipping back into addictive drug abuse. However, his "speedballing" became terribly problematic.

> The defendant advised that his drug use prior to 2004 "is a blur." Prior to 2004, the defendant used opiates "all day," every day. Prior to 2004, the defendant regularly used controlled substances while at clubs with friends, and he routinely placed himself in dangerous situations while using substances, missed school/work obligations, and/or used more substances than he planned to use. With the exception of his relationship with his former wife, the defendant advised that his use of substances did not negatively impact his interpersonal relationships. (Presentence Investigation Report).

The OxyContin/cocaine abuse became a full blown addiction and led to several detox episodes at NORCAP Lodge in Foxboro (a service of the Good Samaritan Medical Center), Salem Hospital in 2002, and a few months in 2004 at Plymouth House (a program in New Hampshire based on the Twelve Steps). This last detox was crucial and led to his largely overcoming his addiction to and use of OxyContin and cocaine. Prior to his stay at the Plymouth House, he had hit "rock bottom." In 2002 - 2003, he had been put on regimen of drugs to detox from opiates. But they didn't work.

> I thought alcohol would help me kick the opiates. So, I took Tylenol PM with alcohol trying to sleep off the withdrawal. I ended up puking for 48 hours. My kidneys shut down and wound up in the hospital for eight days on dialysis. I recovered but there was liver damage.

He continued to use marijuana to help him calm down, stop the chronic worrying about pending incarceration (racing thoughts about what will happen to his mother and father and three children ages seven to eleven: "If I go away, who's gonna take care of my kids. So many people depend on me."), and get the sleep he needs. While he would qualify for the use of medical marijuana in Massachusetts, he has never sought a prescription. This is unfortunate because unlike drugs like Xanax or Valium that could help him sleep but are much more likely to trigger a relapse into drug abuse, marijuana does not appear to endanger his sobriety. He is still regularly active in AA and often functions as a sponsor for those trying to get clean. (As noted in my earlier letter, his thorough knowledge of *The Big Book* and the history of AA attested to the earnestness of this activity.)

At times, he is overwhelmed by his anxiety about his family, his employees, and other people dependent on him. He is convinced that his family will fall apart if he is incarcerated. On one occasion when he went to see his mother, he found her hiding in the closet! His mother, who had never been in any kind of legal trouble, had been traumatized by her earlier arrest. She heard some noise, and thought the police were coming again so she hid in the closet from which she called her sister. Her sister called Mr. Panousos and told him to get there right away. As he arrived he called his mom who was screaming. He had to convince her it was him and not the police. On another occasion, his daughter (Theodora) googled her name. As she happens to have the same name as her grandmother, she found out that Theodora Panousos is a criminal. She was sobbing when her father found her. Mr. Panousos described this experience as heartbreaking.

Given how stretched and fragile his family is (his dad suffers from sciatica and his mother is in recovery from leukemia and hypertension) and the recurrent problems he faces on a daily basis in running his restaurant, it seems that his belief that his restaurant will fail if he is incarcerated is realistic. He had sold another pizza restaurant (Lucky's) to a man who could not run it and ended up declaring bankruptcy. Apparently, such businesses are quite profitable IF one runs them like a Panousos, i.e., lives and breathes the business and works it around the clock. In order to pay back the IRS the money he owes, he is also struggling to renovate and reopen Lucky's.

> The defendant has always worked for the family's restaurant and/or at his own restaurant. Since 2013, the defendant has owned and operated Mike's Famous Roast Beef and Pizza in North Reading, Massachusetts. ... The defendant nets $ 17,300 per month from the business. The business has 27 employees, all of whom would lose their jobs if the defendant was incarcerated, as no one else in a position to assume daily operations of the business if the defendant is not available. (Presentence Investigation Report).

There is no question that Mr. Panousos is suffering from an agitated, anxious depression that is compounded by a severe lack of sleep. After a handful of sessions, it is my opinion that a course of treatment, especially family treatment, is likely to be helpful. While he is overwhelmed with anxiety about an incarceration during which he would lose his business, abandon his fragile family, and leave his ex-wife and their children without support, clearly his problems did not begin with the current charges. His (and his brother's) serious problems with drug abuse and significant issues with impulse control (leading to some relatively minor criminal charges) predate the tax evasion and indicate the existence of longstanding issues that could use attention. Apparently, working 80 to 90 hours a week (that is, the family culture) left some issues unattended to and unresolved. However, Mr. Panousos is not psychologically minded. That is, he does not see psychotherapy as something that he needs and that can be truly useful for him. He is a man of action and, consistent with Twelve Step notions, one helps and gets help by actively supporting and helping one another not by analyzing one's inner, emotional life. Despite this, he is quite willing to participate in sessions with other family members. Family therapy — in which emotional involvement and meaning are quite real and alive — for such a man is likely to be more beneficial than one on one psychotherapy.

As you know, Mr. Panousos is trying to rehab the restaurant (Lucky's) in Haverhill that he used to run (he still owns the building). He believes that he will be able to use the income from that restaurant and Mike's to rapidly pay off the taxes, fines, and penalties he now owes. It is not clear that he will have the chance to do that.

## CONCLUSION

Emanuel Panousos is currently suffering from fairly severe depression and anxiety. Part of the source of the problem is probably long standing and underlay his years of drug abuse. The problem has been compounded by the severe pressure brought to bear on him by his tax evasion and the subsequent legal situation. In my many, many years of experience working in prison settings and treating and evaluating men who have engaged in criminal activity, I can unequivocally say that Mr. Panousos is not a "crimanl type." He is not psychopathic or sociopathic. He does not suffer from an antisocial personality disorder so common among criminals.

In fact, he is quite empathic, clearly concerned about others, and extremely hard working. These traits are completely inconsistent with an antisocial personality. However, there have been some impulse control issues that led to near death eperiences with drug abuse and some relatively minor legal involvement other than the tax evasion case. The tax evasion case also does not suggest antisocial characteristics. Did he know he was cheating on his taxes? Without question. But that simply was his Greek immigrant family's way of doing business. It's true that he didn't question it, but it was

not something he initiated with clear intention and forethought. He didn't cheat people or abuse others through conniving manipulation or abuse of a postiion of power. The point is that he is definitely not a criminal type and the risk of his reoffending in the future is quite low.

　　Not only is an expensive incarceration not necessary to prevent recidivism, it would truly be harmful to the many people who depend on Mr. Panousos. In addition to the toll his misconduct has already inflicted on him, a solid period of probation coupled with some family treatment (with some communication between therapist and probation officer to ensure compliance) could be beneficial. And such a plan would seem to enable him to earn the money he needs to pay what he now owes the IRS.

　　　　　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　　　　　*Daniel Kriegman, Ph.D.*

　　　　　　　　　　　　　　　　　　　Daniel Kriegman, Ph.D.
　　　　　　　　　　　　　　　　　　　Clinical Psychologist

# CURRICULUM VITAE

**DANIEL KRIEGMAN, PH.D.**
20 Dorcar Road
Newton, MA 02467-3021
(617) 527-1631
kriegman@aol.com

## EDUCATION

| | | |
|---|---|---|
| B.A. | State University of New York at Buffalo, 2/1974 | |
| | Major: Psychology | |
| | Honors: Departmental and University Honors, Magna Cum Laude | |
| M.A. | Boston University, 5/1977 | |
| Ph.D. | Boston University, 4/1980 | |
| | Area: Clinical Psychology | |
| | NIMH Fellowship: 1974-75, 1975-76 | |
| | Teaching Fellowship: 1974-75 | |

## CLINICAL and ADMINISTRATIVE EXPERIENCE

**1981 -** Private Practice, Cambridge and Newton, MA. *Individual, couple, family, and group psychotherapy, clinical supervision, evaluations of Sexual Dangerousness, expert witness evaluations, and testimony for the courts (risk assessment, aid-to-sentencing, treatment planning, custody evaluations).*

**1989 - 1995** Clinical Director, Counseling and Psychotherapy Center of Greater Boston (a private, group practice).

**1987 - 1993** Founder & President, Human Services Cooperative, Inc. (a worker-owned, human service provider operating through contracts with state agencies, third party payers, and client fees). *Oversaw the operation and rapid growth (beginning in fiscal year 1990, revenues exceeded 1.2 million dollars) of a human service provider agency. Contracts included the Crisis Services Program at the Solomon Mental Health Center in Lowell (staff of 18 highly experienced masters and doctoral level clinicians and psychiatrists providing the first line of contact [including containment and stabilization, if necessary] and referral for mental health clients in the Lowell catchment area) and all of the psychological and psychiatric services (e.g., court evaluations and psychopharmacology) at the Massachusetts Treatment Center for the Sexually Dangerous Offender.*

**1986 - 1987** Director of Clinical Services, Counseling Services of Massachusetts Mentor, Inc. (a licensed mental health clinic with three sites). *Responsible for selection of all staff, establishment of job descriptions and assignments, overall supervision of staff, policies and procedures, program evaluation, in-service training for professional staff, and budget management.*

**1977 - 1986** Chief Psychologist, Massachusetts Treatment Center for the Sexually Dangerous Offender (a two hundred fifty bed, long-term, secure inpatient facility). *Began in 1977 as a Staff Psychologist in a part-time position consisting of intensive individual and group psychotherapy, intake evaluations, diagnostic testing, and evaluations for community access. Later held the position of Unit Director for approximately 130 committed patients, responsible for all clinical services on the unit. Most recent position included two separate areas of responsibility: Director of Supervision and Training for the direct service staff (over 50 non-custodial, clinical, DMH employees); Director of Intake and Treatment Planning for all patients sent to the Treatment Center for evaluation for commitment (Intake), and those who were newly committed (Treatment Planning).*

**1981 - 1983** Psychologist, North Shore Professional Associates, Inc., Beverly, MA; (a private group practice). *Part-time position consisting of individual, couples, and family treatment, psychodiagnostic testing, psychotherapy supervision, and custody evaluations for the courts.*

**1981 - 1982** Family Therapist, Family Continuity Program, Beverly, MA (an outpatient alternative to hospitalization that provides a variety of intensive services to the family of an "identified" adolescent patient). *Part-time position consisting of family therapy (often provided in the home of a "dysfunctional" family), individual and group psychotherapy, and clinical supervision.*

**1979 - 1981** Clinical Director, Adolescent Rehabilitation Program at the Dr. Solomon Carter Fuller Mental Health Center (an intensive, highly-funded, long-term, secure, inpatient unit for severely disturbed, acting out adolescents). *Full-time position supervising 40 clinical, educational, and milieu staff responsible for the overall treatment, education, and management of 12 adolescents, and expert witness evaluations and testimony for the courts (commitment hearings).*

## RESEARCH and TEACHING

**2005 - 2012** Editorial Board, *The Journal of Sexual Offender Civil Commitment: Science and the Law*. A peer-reviewed journal publishing articles of original research, review, and commentary on issues related to the civil commitment of sexual offenders, including assessment and treatment of sexual offenders.

**1998 - 2004** Faculty, Psychoanalytic Couple and Family Institute of New England

| | |
|---|---|
| 1993 - 2003 | Faculty, Massachusetts Institute for Psychoanalysis |
| 1981 - 1988 | Seminars at the Northeast Society for Group Psychotherapy and seminars and courses at the Boston Institute for Psychotherapy. |
| 1974 - 1980 | Doctoral Thesis, Boston University: A psychosocial study of religious cults from the perspective of self psychology. |
| 1977 - 1979 | Instructor: Boston University, Lesley College, and Massasoit College. Seven courses in these areas: General Psychology, Introduction to Abnormal Psychology, and Personality Theory. |
| 1977 - 1978 | Psychological Testing Supervisor, Boston University Graduate School: Psychodiagnostic Testing. |
| 1974 - 1975 | Teaching Fellow, Boston University: Personality Theory, Abnormal Psychology. |
| 1973 - 1974 | Teaching Assistant, SUNY at Buffalo: Research Methods. |

## PUBLICATIONS and PAPERS

Kriegman, D. & Biederman, I. (1980). How many letters in Bidwell's ghost? An investigation of the upper limits of full report from a brief visual stimulus. *Journal of Perception and Psychophysics*, 28, 82-84. Featured in *Scientific American*, 252, 2, 126-127, 1985.

Kriegman, D. & Solomon, L. (1985a). Cult groups and the narcissistic personality: The offer to heal defects in the self. *International Journal of Group Psychotherapy*, 35, 2, 239-261.

Kriegman, D. & Solomon, L. (1985b). Psychotherapy and the "new religions": Are they the same? *Cultic Studies Journal*, 2, 1, 2-16.

Kriegman, D. (1986). The treatment of the sexually dangerous offender: a multi-modal approach utilizing the perspective of self psychology. Paper presented at The Massachusetts Treatment Center for Sexually Dangerous Persons.

Kriegman, D. (1988). Self psychology from the perspective of evolutionary biology: Toward a biological foundation for self psychology. In A. Goldberg (Ed.), *Progress in Self Psychology* (Vol. 3, pp. 253-274). Hillsdale, New Jersey: The Analytic Press.

Slavin, M. O. & Kriegman, D. (1988). Freud, biology, and sociobiology. *American Psychologist*, 43, 658-661.

Kriegman, D. & Knight, C. (1988). Social evolution, psychoanalysis, and human nature. *Social Policy*, 19, 2, 49-55.

Kriegman, D. & Slavin, M. O. (1989). The myth of the repetition compulsion and the negative therapeutic reaction: An evolutionary biological analysis. In A. Goldberg (Ed.), *Progress in Self Psychology,* (Vol. 5, pp. 209-253). Hillsdale, NJ: Analytic Press.

Slavin, M. O. & Kriegman, D. (1990). Toward a new paradigm for psychoanalysis: An evolutionary biological perspective on the classical-relational dialectic. *Psychoanalytic Psychology*, 7, 5-31.

Kriegman, D. & Slavin, M. O. (1990). On the resistance to self psychology: Clues from evolutionary biology. In A. Goldberg (Ed.), *Progress in Self Psychology,* (Vol. 6, pp. 217-250). Hillsdale, NJ: Analytic Press.

Kriegman, D. (1990). Compassion and altruism in psychoanalytic theory: An evolutionary analysis of self psychology. *Journal of the American Academy of Psychoanalysis*, 18, 2, 342-367.

Slavin, M. O. & Kriegman, D. (1992). Psychoanalysis as a Darwinian depth psychology: Evolutionary biology and the classical-relational dialectic in psychoanalytic theory. In J. Barron, M. Eagle, and D. Wolitzky (Eds.), *The Interface of Psychoanalysis and Psychology* (pp. 37-76). Washington, DC: American Psychological Association.

Slavin, M. O. & Kriegman, D. (1992). *The Adaptive Design of the Human Psyche: Psychoanalysis, Evolutionary Biology, and the Therapeutic Process*. NY: Guilford Press.

Kriegman, D. (1996). On the existential/subjectivism-scientific/objectivism dialectic in self psychology: A view from evolutionary biology. In A. Goldberg (Ed.), *Progress in Self Psychology* (Vol. 12, pp. 85-119). Hillsdale, NJ: Analytic Press.

Kriegman, D. (1996). The effectiveness of medication: The *Consumer Reports* study. *American Psychologist*, 51, 10, 881.

Kriegman, D. and Kriegman, O. (1997). War and the evolution of the human propensity to form nations, cults, and religions. Paper presented at the Human Behavior and Evolution Society Annual Conference (June 7, Tucson, AZ).

Kriegman, D. (1998). Interpretation, the unconscious, and psychoanalytic authority: Toward an evolutionary, biological integration of the empirical/scientific method with the field-defining, empathic stance. In R.F. Bornstein & J.M. Masling (Eds.), *Empirical Perspectives on the Psychoanalytic Unconscious* (pp. 187-272). Washington, DC: American Psychological Association.

Slavin, M. O. & Kriegman, D. (1998). An evolutionary biological perspective on psychoanalysis. In Robert Langs, (Ed.), *Theories in Psychoanalysis* (pp. 255-296). NY: International Universities Press.

Slavin, M. O. & Kriegman, D. (1998). Why the analyst needs to change: Toward a theory of conflict, negotiation, and mutual influence in the therapeutic process. *Psychoanalytic Dialogues*, 8, 2, 247-284.

Slavin, M. O. & Kriegman, D. (1998).  Bigger than both of us:  Double binds, conflicting interests, and the inherent paradoxes of human relatedness. *Psychoanalytic Dialogues*, 8, 2, 317-327.

Slavin, M. O. & Kriegman, D. (1998).  Paradox and conflict, meta-communication and negotiation in psychoanalysis:  Response to Dr. Ringstrom's discussion. *Psychoanalytic Dialogues*, 8, 2, 293-296.

Slavin, M. O. & Kriegman, D. (1998).  Conflicting interests and the creation of a third space. *Psychoanalytic Dialogues*, 8, 3.

Kriegman, D. (1998).  Evolutionary psychoanalysis:  An advance in understanding the human psyche or a phylogenetic fantasy. *Contemporary Psychology*, 43, 2, 138-139.

Kriegman, D. (1998).  Of quantum leaps and oxymorons:  A reply to Langs. *Contemporary Psychology*.

Teicholz, J. G. & Kriegman, D. (Eds.).  (1998). *Trauma, Repetition, & Affect Regulation:  The Work of Paul Russell.* New York:  The Other Press.

Kriegman, D. (1999).  Trauma, conflict, and countertransference: A discussion of Peter Thomson's paper. *Canadian Journal of Psychoanalysis*, 7, 1, 59-62.

Kriegman, D. (1999).  Parental investment, sexual selection, and evolved mating strategies:  Implications for psychoanalysis. *Psychoanalytic Psychology*, 16, 4, 1-26.

Kriegman, D. (2000).  Evolutionary psychoanalysis:  Toward an adaptive, biological perspective on the clinical process in psychoanalytic psychotherapy. In P. Gilbert and K. Bailey (Eds.), *Genes on the Couch:  Explorations in Evolutionary Psychology* (pp. 71-92).  East Sussex, England:  Psychology Press.

Kriegman, D. An application of self psychology to projective testing:  Using the Rorschach to measure stability of self structures. Submitted for publication.

Kriegman, D. (2002).  Interpreting & Negotiating Conflicts of Interests in the Analytic Relationship.  In A. Goldberg (Ed.), *Progress in Self Psychology* (Vol. 18, pp. 87-112).  Hillsdale, NJ:  Analytic Press.

Kriegman, D.  (2006).  The reduction of sexual offense recidivism following commitment and psychodynamic treatment:  A challenge to the dominant cognitive-behavioral model. *The Journal of Sexual Offender Civil Commitment:  Science and the Law,* 1, 90-98.

Kriegman, D. (2014).  The New Salem Witch Trials:  Evaluating bias in expert witness conclusions of "sexual dangerousness.  Part One." *Sex Offender Law Report.* 15(4) Jun./Jul.

Kriegman, D. (2014).   The New Salem Witch Trials:  Evaluating bias in expert witness conclusions of "sexual dangerousness.  Part Two." *Sex Offender Law Report.* 15(5) Aug./Sep.

## MEMBERSHIPS, LICENSURE, and CERTIFICATIONS

American Psychological Association
Licensed Psychologist, Massachusetts
Health Service Provider under M.G.L. c. 112, § 120
Qualified Psychologist for Section 12 commitments pursuant to 104 CMR 3.20 (2)
  under M.G.L. c. 123 § 12A
Qualified Examiner for evaluations of "Sexual Dangerousness" under M.G.L. c. 123A § 1
  (designated by the Massachusetts Department of Mental Health in 1986)